**WEST/CRS**

## 2012-1167

# In the
# United States Court of Appeals
# For The Federal Circuit

REGENTS OF THE UNIVERSITY OF MINNESOTA,

*Plaintiff-Appellant,*

v.

AGA MEDICAL CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the District of Minnesota in Case No. 07-cv-4732,
Judge Patrick J. Schiltz

## CORRECTED BRIEF OF DEFENDANT-APPELLEE
## AGA MEDICAL CORPORATION

Alan G. Carlson
J. Derek Vandenburgh
R.J. Zayed
Tara C. Norgard
CARLSON, CASPERS, VANDENBURGH,
LINDQUIST & SCHUMAN, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, Minnesota 55402
(612) 436-9600

*Attorneys for Defendant-Appellee*
*AGA Medical Corporation*

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

JUN 12 2012

JAN HORBALY
CLERK

Dated: June 19, 2012

Form 9

FORM 9.  Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

REGENTS UNIVERSITY OF MINNESOTA v. AGA MEDICAL CORPORATION

No. 2012-1167

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellee AGA Medical Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

AGA Medical Corporation

---

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

AGA Medical Corporation

---

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

AGA Medical Corporation is a wholly-owned subsidiary of AGA Medical Holdings Incorporated, which is a wholly owned subsidiary of St. Jude Medical, Incorporated, a publicly traded company (NYSE: STJ)

---

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Alan G. Carlson, J. Derek Vandenburgh, R.J. Zayed, Tara C. Norgard; Carlson, Caspers, Vandenburgh, Lindquist & Schuman, P.A., 225 South Sixth Street, Suite 4200, Minneapolis, MN 55402

June 19 2012
Date

Signature of counsel

J. Derek Vandenburgh
Printed name of counsel

Please Note: All questions must be answered
cc: Kevin D. Conneely, Esq.

124

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ................................................... 1

I. STATEMENT OF THE FACTS .......................................................... 1

   A. Introduction. ................................................................................. 1

   B. The Das Patent Family. ............................................................... 2

      1. The Specification. ................................................................... 3

      2. The '217 Patent. ..................................................................... 6

      3. The '291 Patent. ..................................................................... 8

      4. The '281 Patent. ................................................................... 10

   C. AGA's Unitary Mesh Occluders. .............................................. 13

   D. The Relevant District Court Orders. ......................................... 15

II. SUMMARY OF THE ARGUMENT ................................................ 17

III. ARGUMENT ................................................................................. 19

   A. Standard of Review. ................................................................... 19

   B. AGA's Devices Do Not Infringe the '291 Patent. .................... 20

      I. The University Wrongly Characterizes the District Court's
         Ruling. ................................................................................. 20

      2. The District Court Correctly Construed the Claims of the
         '291 Patent to Cover Only Disks that Have Been
         Physically Attached **to** One Another......................................... 23

         a. The Plain Meaning of the Terms Supports the District
            Court's Construction. ...................................................... 23

         b. The Specification Shows that the Invention Consisted
            of Originally Separate Disks that Were Brought
            Together. ......................................................................... 25

c. The Prosecution History Further Supports the District Court's Construction. ..................................................... 30

d. The Extrinsic Evidence Also Supports a Construction Requiring a Non-Unitary Structure. ............................... 31

e. The District Court's Construction Does Not Improperly Limit the Claims Based on a Particular Method of Manufacture. ............................................... 32

3. There Is No Evidence Supporting Infringement Under the District Court's Correct Claim Construction. .......................... 34

C. The Claims of the '281 Patent Are Both Invalid and Not Infringed by AGA's Devices. ............................................................................. 35

1. Under the Proper Construction of "In Communication With," AGA's Devices Do Not Infringe the '281 Patent. ................... 35

a. The Intrinsic Evidence Shows that "In Communication With" Means "Affixed To. ............................................. 35

b. The Patentee's Intent to Broaden Claims Is Ineffective When, as Here, the Claim Language Is Not Clear and the Specification Does Not Support a Broader Construction. ................................................................... 38

2. Under the District Court's Construction of "In Communication With," the Asserted Claims of the '281 Patent Are Anticipated by King and Lock. .............................. 42

a. Under the District Court's Claim Construction, the King and Lock Devices Satisfy the "In Communication With" Requirement. ............................. 43

i. There is No Basis in the Claim Language to Limit "Transmission of Movement" to Any Particular Type of Movement. ............................................. 44

ii. The University's "Substantial Portions" Argument Also Ignores the Claim Language. ....................... 46

b. King Discloses "A Self-Expanding Structure Exhibiting a Spring-Like Behavioural Component for Moving the Member Between a Compressed Orientation . . . and an Expanded Orientation."............. 48

i. The University Did Not Disclaim a Radially Extending Frame as a Structure for Moving the Claimed Device from a Compressed to an Expanded Orientation. ......................................................... 49

ii. For the Purpose of the Claimed Function, the Radial Frames of King and Lock Are Equivalent to the Peripheral Frame Structure in the '281 Patent. ... 53

3. The Claims of the '281 Patent Are Indefinite. ............................... 57

a. Legal Principals. .................................................. 57

b. One Cannot Determine What Performs the Tautly Holding Function. .......................................... 58

c. The District Court Did Not Err by Finding the Claims Both Anticipated and Indefinite..................................... 62

CONCLUSION ............................................................................. 63

# TABLE OF AUTHORITIES

## Cases

*ACTV, Inc. v. Walt Disney Co.*
  346 F.3d 1082 (Fed. Cir. 2003) .................................................. 21

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*
  265 F.3d 1294 (Fed. Cir. 2001) .................................................. 50

*Allen Eng'g Corp. v. Bartell Indus., Inc.*
  299 F.3d 1336 (Fed. Cir. 2002) .................................................. 59

*Applied Med. Res. Corp. v. United States Surgical Corp.*
  448 F.3d 1324 (Fed. Cir. 2006) .................................................. 54

*Atofina v. Great Lakes Chem. Corp.*
  441 F.3d 991 (Fed. Cir. 2006) ............................................... 30, 31

*Ballard Med. Prods. v. Allegiance Healthcare Corp.*
  268 F.3d 1352 (Fed. Cir. 2001) .................................................. 51

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*
  616 F.3d 1249 (Fed. Cir. 2010) .................................................. 29

*Brown v. 3M*
  265 F.3d 1349 (Fed. Cir. 2001) .................................................. 47

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*
  424 F.3d 1293 (Fed. Cir. 2005) .................................................. 28

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*
  893 F. Supp. 508 (D. Md. 1995) ................................................. 34

*Datamize, L.L.C. v. Plumtree Software, Inc.*
  417 F.3d 1342 (Fed. Cir. 2005) .................................................. 20

*Dentsply International, Inc. v. Hu-Friedy Mfg. Co., Inc.*
  202 F. App'x 464 (Fed. Cir. 2006) ............................................. 28

*Edwards Lifesciences L.L.C. v. Cook Inc.*
  582 F.3d 1322 (Fed. Cir. 2009) .................................................. 37

*Funai Elec. Co. v. Daewoo Elecs. Corp.*
   616 F.3d 1357 (Fed. Cir. 2010) .......................................................... 60

*Gen-Probe Inc. v. Becton Dickinson & Co.*
   No. 09-cv-2319, 2011 U.S. Dist. LEXIS 131820, (S.D. Cal. Nov. 15, 2011) ..................................................................................................... 23

*Gillette Co. v. Energizer Holdings, Inc.*
   405 F.3d 1367 (Fed. Cir. 2005) .......................................................... 31

*Honeywell Int'l, Inc. v. ITT Indus. Inc.*
   452 F.3d 1312 (Fed. Cir. 2006) .................................................... 26, 37

*In re Guess*
   347 F. App'x. 558 (Fed. Cir. 2009) ..................................................... 55

*Indiana Mills & Mfg., Inc. v. Dorel Indus., Inc.*
   369 F. Supp. 2d 1010 (S.D. Ind. 2005) ............................................... 24

*Int'l Seaway Trading Corp. v. Walgreens Corp.*
   589 F.3d 1233 (Fed. Cir. 2009) .......................................................... 53

*Invitrogen Corp. v. Clontech Labs., Inc.*
   429 F.3d 1052 (Fed. Cir. 2005) .......................................................... 50

*Irdeto Access, Inc. v. Echostar Satellite Corp.*
   383 F.3d 1295 (Fed. Cir. 2004) .......................................................... 19

*J&M Corp. v. Harley-Davidson, Inc.*
   269 F.3d 1360 (Fed. Cir. 2001) .......................................................... 51

*JVW Enters. v. Interact Accessories, Inc.*
   424 F.3d 1324 (Fed. Cir. 2005) .............................................. 48, 54, 55

*Laitram Corp. v. Morehouse Indus., Inc.*
   143 F.3d 1456 (Fed. Cir. 1998) .......................................................... 31

*Liebel-Flarsheim Co. v. Medrad Inc.*
   358 F.3d 898 (Fed. Cir. 2004) ...................................................... 39, 40

*Markman v. Westview Instruments, Inc.*
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) .................. 25

*MBO Labs., Inc. v. Becton, Dickinson & Co.*
  474 F.3d 1323 (Fed. Cir. 2007) ........................................................ 26

*Metrologic Instruments, Inc. v. Symbol Techs., Inc.*
  460 F. Supp. 2d 571 (D.N.J. 2006) ........................................ 50, 51, 52

*Morton Int'l, Inc. v. Cardinal Chem. Co.*
  5 F.3d 1464 (Fed. Cir. 1993) ........................................................... 58

*NTP, Inc. v. Research in Motion, Ltd.*
  418 F.3d 1282 (Fed. Cir. 2005) ....................................................... 29

*Nystrom v. TREX Co.*
  424 F.3d 1136 (Fed. Cir. 2005) ....................................................... 42

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*
  521 F.3d 1351 (Fed. Cir. 2008) ....................................................... 22

*Omega Eng'g, Inc. v. Raytek Corp.*
  334 F.3d 1314 (Fed. Cir. 2003) ....................................................... 30

*On Demand Mach. Corp. v. Ingram Indus., Inc.*
  442 F.3d 1331 (Fed. Cir. 2006) ................................................... 40, 41

*Ormco Corp. v. Align Tech., Inc.*
  498 F.3d 1307 (Fed. Cir. 2007) ................................................... 26, 37

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*
  806 F.2d 1565 (Fed. Cir. 1986) ....................................................... 58

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*
  520 F.3d 1358 (Fed. Cir. 2008) ....................................................... 36

*Phillips v. AWH Corp.*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................... 25, 36

*Powell v. Home Depot U.S.A., Inc.*
  663 F.3d 1221 (Fed. Cir. 2011) ................................................... 28, 29

*R2 Med. Sys., Inc. v. Katecho, Inc.*
  931 F. Supp. 1397 (N.D. Ill. 1996) ................................................... 33

*Renishaw PLC v. Marposs Societa' per Azioni*
    158 F.3d 1243 (Fed. Cir. 1998) ......................................................... 36

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*
    653 F.3d 1296 (Fed. Cir. 2011) ................................................... 28, 29

*Searfoss v. Pioneer Consol. Corp.*
    374 F.3d 1142 (Fed. Cir. 2004) ......................................................... 27

*Sitrick v. Dreamworks, L.L.C.*
    516 F.3d 993 (Fed. Cir. 2008) ........................................................... 57

*Southwall Techs., Inc. v. Cardinal IG Co.*
    54 F.3d 1570 (Fed. Cir. 1995) ........................................................... 31

*Spectralytics, Inc. v. Cordis Corp.*
    576 F. Supp. 2d 1030 (D. Minn. 2008)............................................... 33

*Stamps.com Inc. v. Endicia, Inc.*
    437 F. App'x 897 (Fed. Cir. 2011) .................................................... 63

*Tandon Corp. v. U.S. Int'l Trade Com.*
    831 F.2d 1017 (Fed. Cir. 1987) ............................................. 40, 41, 42

*Thomas v. Corwin*
    483 F.3d 516 (8th Cir. 2007) ............................................................. 57

*Toro Co. v. White Consol. Indus., Inc.*
    199 F.3d 1295 (Fed. Cir. 1999) ......................................................... 28

*Upsher-Smith Labs. v. Pamlab, L.L.C.*
    412 F.3d 1319 (Fed. Cir. 2005) ......................................................... 20

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*
    234 F.3d 1370 (Fed. Cir. 2000) ......................................................... 33

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*
    473 F.3d 1173 (Fed. Cir. 2006) ................................................... 50, 52

*V-Formation, Inc. v. Benetton Group SpA*
    No. 01 Civ. 610, 2002 U.S. Dist. LEXIS 22394, (S.D.N.Y. Nov. 20, 2002)...... 24

**Statutes**

35 U.S.C. § 102 ....................................................................................... 7

35 U.S.C. § 112 ............................................................. 48, 57, 58, 59, 61

## STATEMENT OF RELATED CASES

In pending Reexamination Application No. 90/011,290, the examiner found the '281 patent-in-suit invalid.  The reexamination is on appeal to the BPAI.  Part I.B.4.b.

## I.   STATEMENT OF THE FACTS

The University's "Statement of the Facts" omits critical information regarding the patents in suit, the PTO proceedings that resulted in those patents, and AGA's devices.

### A.     Introduction.

This case is the result of a patentee using prosecution procedures to try to cover something that the inventor, Dr. Gladwin Das, did not invent.  The original patent obtained by the University on behalf of Dr. Das, U.S. Patent No. 5,334,217 ("the '217 patent") described the arguably novel aspects of his "angel wings" septal occluder.  To obtain its original '217 patent, the University distinguished the prior art based on two features of Dr. Das's invention: (1) two membranes with central portions affixed to form a "conjoint disk," and (2) frames extending around the periphery of the two disks.  (A1707.)  The University has not asserted the '217 patent in this case.

However, when it became clear during clinical trials that the angel wings device was going to fail, the University changed its focus to try to cover AGA's

fundamentally different septal occluder. Ultimately, the University obtained the two patents in suit, U.S. Patent Nos. 6,077,291 ("the '291 patent") and 6,077,281 ("the '281 patent"). In the '291 patent, the University removed the requirement of a peripheral frame, but continued to claim two disks "affixed," "connected," or "joined" to one another. On the basis of these terms, the district court granted summary judgment that AGA's unitary wire mesh occluders do not infringe the '291 patent.

In the '281 patent, the University abandoned both of the features that distinguished its invention over the prior art. During prosecution, however, the case was reassigned to a new examiner who never revisited the prior rejection made by the examiner of the '217 and '291 cases. Since the claims no longer contained the language included in the earlier Das patents to distinguish them over the prior art, the district court granted summary judgment of anticipation. The Patent and Trademark Office has preliminarily reached the same conclusion in a pending reexamination.

## B.    The Das Patent Family.

The patents in suit are the last of a family of patents ("the Das patents") that claim priority to an original application filed on January 21, 1992. All of the Das patents have essentially the same specification and differ only in the claims.

### 1.    The Specification.

The Das patents are directed to septal defect closure devices.  As discussed

on pages 4–8 of the University's brief, such devices are intended to be delivered

via catheter to the inside of a human heart, where they are deployed to block an

unwanted hole ("septal defect") between chambers of the heart, such as the one

shown in Figure 1:



Fig. 1

(A105.)

The Background section of the Das patents discusses several prior art septal

occluding devices, including those shown in U.S. Patent No. 3,874,388 ("King").

(A114.)  King shows a device having first and second disks 8/9, each consisting of

an umbrella frame with elastically collapsible radial arms 81/91 covered by a

membrane 82/92.  (A5177, col.6 ll.8–61.)  The disks of King are interconnected at

their respective center hub 84 and sleeve 94:



**FIG. IC.**

**FIG. 9K.**

(A5165; A5171.) The Das patents criticize King and other prior art devices as being "mechanically complex," and having disk members that join each other "at a single point or pivot." (A114, col.2 ll.42–61.) According to the Das patents, such a point connection makes it difficult to properly center the device because the point connection tends to ride to the lower margin of the defect. (*Id.*)

The Summary of the Invention states that Das solved these alleged problems by doing two things: (1) replacing the radial frame with a frame that is "carried about [the] periphery" of the membrane; and (2) "affixing" the central portions of the fabric membranes to one another to form a "conjoint disk" that is sized to fill the defect. (A115, col.3 ll.8–20.)

The preferred embodiment of the Das patents is shown in Figures 3–4:



*Fig. 3*                    *Fig. 4*

(A106.)  Each disk 20/30 is made up of a frame 24/34 extending around a

membrane 22/32.  (A115, col.4 1.56–col.5 1.15.)  The central portions of the

membranes (shown by dashed lines in Figure 4) are overlapped and attached to

each other to define conjoint disk 40.  (A117, col.7 ll.42–59.)  The conjoint disk is

preferably sized to be roughly the same size as the septal defect.  (*Id.*, col.8 ll.14–

17.)  The legs 26 of the frame are made up of a resilient material such as nitinol.

(A116–17, col.6 1.66–col.7 1.4.)

The device is loaded in a catheter by folding each of the legs 26 at the

middle of the legs.  (A119, col.11 ll.5–24.)  Figure 8 shows the device with folded

legs inside the catheter:



Fig. 8

(A109.) The device is then pushed through the catheter to the distal end positioned in the heart, where the disks are pushed out of the catheter, one at a time, on either side of the septal defect. (A119, col.11 l.53–col.12 l.42.) When released from the catheter, the legs unfold and the frame expands to pull the membrane "taut." (A116, col.5 ll.5–15.) This "tautness" in the fabric membrane causes the disks to press inwards against one another "into a taut, generally planar shape" when not acted on by an outside force. (*Id.*)

### 2.     The '217 Patent.

The first patent to issue in the Das patent family was the '217 patent, which issued via a continuation application from the original application in the Das family, Application No. 07/822,951 ("the '951 application"). As originally filed, the claims of the '951 application contained both of the limitations identified in the Summary of the Invention as distinguishing the invention over the prior art: (1) an elastically deformable frame "carried about the periphery of the membrane"; and

(2) a central portion of the membrane of one disk "affixed to a central portion of the membrane of the second disk to define a central conjoint disk." (A5227.)

In the first Office Action, the PTO Examiner rejected claim 1 under 35 U.S.C. § 102 as anticipated by King. (A5251.) He said that the King frames were "carried about" the periphery and "the disks are affixed to each other at the central portions . . . ." (*Id.*)

In response, the University amended claim 1 to delete "carried about" and add that each frame was "extending along and attached adjacent to the periphery of the membrane." (A1698.) In the arguments accompanying the amendment, the University characterized its "invention" as follows:

> A septal defect closure device of the invention utilizes two disks which are each formed of a membrane and a frame. The frame is designed to extend along the periphery of the membrane rather than utilize a series of radially extending arms such as those used by King.
>
> * * * *
>
> Additionally, applicant attaches the membranes of the two disks essentially directly to one another rather than using the complex multi-component hub utilized by King.

(A1707.) Based on this argument, the Examiner withdrew the rejection of claim 1 based on King. (*See* A1726.) The Examiner stated that "[t]he primary reason for the allowance of the claims is the inclusion, in all the claims, of the limitation that

7

in a septal defect closure device, a first membrane is connected to a central portion of a second membrane to form a conjoint disk." (A5274.)

The University has not accused AGA of infringing the '217 patent.

### 3.    The '291 Patent.

The application for the '291 patent was filed on November 26, 1996, a little more than two years after the '217 patent issued. Two things happened during that two-year period. One, Dr. Das's angel wings occluder (the commercial embodiment very similar to Figures 3 and 4 of the Das patents) proved to have serious problems relative to deliverability and retrievability of the device. Two, Dr. Das and the University saw the AGA Amplatzer occluder. (*See* A5324 at 467–69; A5325; A5326.) Thus began the University's efforts to obtain a claim that covered AGA's devices.

The University needed a claim that did not recite a frame because, as discussed below, the AGA occluder does not have the frame described in the specification. In a Supplemental Amendment dated June 2, 1997, the University amended application claim 31 (which became claim 1 of the '291 patent) to remove the frame limitation. (A1149–50.) This amendment eliminated one of the two features that was capable of distinguishing King. As noted above, however, the Examiner had previously signaled that he was unimpressed with the peripheral frame limitation to support patentability when he said that joining the membranes

together to form a conjoint disk was what caused him to allow the '217 patent. (A5274.)

At this time, the University kept the requirement that membranes be affixed to one another at their central portions to form a conjoint disk. (A1149–55.) Consistent with his reason for allowing the '217 patent, the Examiner did not reject the amended claims of the '291 application over the prior art. Instead, the only rejection was for obviousness-type double patenting in view of the '217 patent. (A1164–76.)

Thereafter, the University again amended the claims. Among other things, the University deleted the express requirement for a "conjoint disk" from many claims. (A1195, A6895–97.) In some of the claims, the University also replaced the words "affixed to" with synonyms such as "connected to" and "joined to." (*Id.*) The University did not tell the PTO examiner that a change in claim scope was intended by this latter change, nor did the University retract its earlier statement—used to distinguish King—that the invention requires two membranes attached essentially directly to each other. After submission of a terminal disclaimer to overcome the double patenting rejection, the '291 patent was allowed.

As issued, the '291 patent has five independent claims. Of relevance to the present appeal, independent claims 1 and 30 require that a central portion of the

9

membrane of one disk be "affixed to" a central portion of the membrane of the

other disk. (A122.)  Similar language is contained in the other independent claims:

### Claim 17

. . . a portion of the structure of the first disk being joined to a portion of the structure of the second disk by a joining segment having a size approximating the size of the defect;

### Claim 24

. . . a central portion of the membrane of the first disk being joined to a central portion of the membrane of the second disk with a piece of another material being disposed between the affixed central portions of the first and second disks.

### Claim 28

. . . a portion of the first disk being connected to a portion of the second disk by a tubular segment sized to approximate the size of the defect;

(A122–23.)  During the claim construction phase of the present litigation, the

University agreed and admitted that each of the terms "affixed," "connected," and

"joined" in the claims of the '291 patent all have the same meaning.  (A2424–25.)

### 4.    The '281 Patent.

In the '281 patent application, the University totally abandoned the claim

language that distinguished the claim over King.  As in the '291 patent, new claim

31 of the '281 application (which became claim 1 of the '281 patent) omitted the

requirement for a frame extending around the periphery of a membrane.  (A5306.)

In fact, it did not even recite a membrane. Instead, claim 31 of the '281 application generically recited first and second "members," each comprising "a self-expanding structure exhibiting a spring-like behavioral component." (*Id.*)

The University also dropped the language stating that central portions of membranes are affixed to one another to form a conjoint disk, replacing it with the following:

> at least a substantial portion of the central portion of the first member being in communication with at least a substantial portion of the central portion of the first [sic] member.

(*Id.*)

The '281 application was assigned to a different examiner. His only rejection was for provisional obviousness-type double patenting in view of the then-pending claims in the '291 application. (A5310.) After the University filed a terminal disclaimer, the claims were allowed just nine months after the application was filed. The sole independent claim of the '281 patent reads follows:

> 1. A septal defect closure device comprising a first member and a second member each comprising a self-expanding structure exhibiting a spring-like behavioural component for moving the member between a compressed orientation for passage through a medical instrument having an inner diameter and an expanded orientation having an enlarged diameter for tautly holding at least a portion of the closure device against a septum, the enlarged diameter of the member being greater than the inner diameter of the medical instrument; each of the first and second members also including a

> central portion, at least a substantial portion of the central
> portion of the first member being in communication with
> at least a substantial portion of the central portion of the
> first [sic] member.

(A142.)

There are several indications that the examination of the '281 patent was cursory at best and that the new Examiner did not appreciate the scope of the '281 claims. One, he did not notice the obvious error in claim 1 where the "first member" was said to be in communication with the "first member."[1] Two, he did not object to the lack of antecedent basis for "the disks" in dependent claim 2. Three, in making the provisional double patenting rejection, the Examiner said the difference between claim 1 of the '281 patent and claim 1 of the '291 patent was the omission from claim 1 of the '281 patent of the recitation of the *size* of the conjoint disk. (A5310.) But there was a much more fundamental difference: Claim 1 of '281 did not recite a conjoint disk *at all.* Despite the fact that the University had omitted both of the limitations that had convinced the first Examiner to withdraw the rejection based on King, the second Examiner never rejected the claims of the '281 patent based on King or any other prior art.

In 2010, AGA filed for *ex parte* reexamination of the '281 patent based on King and other references. The PTO has agreed that claim 1 of the '281 patent is

---

[1] The University subsequently obtained a certificate of correction to correct this error. (A143.)

12

anticipated by King, and the reexamination is currently on appeal to the PTO

Board of Patent Appeals and Interferences. *See* U.S. Application Serial No.

90/011,290 (available on PAIR at www.uspto.gov).

### C.   AGA's Unitary Mesh Occluders.

AGA developed the first widely-implanted septal occluder devices, which

have revolutionized the treatment of septal defects. The key to the success of

AGA's occluders is their unique one-piece braided mesh design. All of the

accused products have a tubular braid of nitinol wire mesh that is molded into a

desired shape. (A2830–32.) Prior to molding, the nitinol mesh looks like this:



Figure 1: Nitinol wire mesh tubular braid, shown after braiding the 72 wires and before
compression to the reduced diameter seen in Figures 2 and 3.

(A2829–34.)

The ends of the braided mesh shown above are clamped together and the

mesh is placed into a mold and heat-set into a unitary structure made up of two

opposing disc-shaped portions and a narrowed waist portion. The following two

photographs of AGA's ASD ("atrial septal defect") occluder show these features:

   

**ASD Occluder**
**(deployed shape)**

**ASD Occluder**
**(slightly elongated shape)**

The photo on the left shows the occluder in the shape it would tend to assume when deployed in a defect and the photo on the right shows the occluder in a slightly elongated state created by pulling on the posts at each end. As can be seen above, polyester fabric patches are placed within the molded tubular braid to help block the flow of blood through the defect. (A2832.)

Unlike Dr. Das's "angel wings" device and other prior art devices that are folded for insertion into a catheter, AGA's unitary mesh devices are straightened out for placement in the catheter, similar to what is shown in the following photograph:



14

(A2834.) Because of the way that AGA's occluders collapse, they are much easier to deliver to the desired location in the heart. Also, if it is necessary to reposition the device during implantation, AGA's occluders can be withdrawn back into the delivery catheter simply by pulling on the wire attached to one end of the device. (A3263–64.)

### D.    The Relevant District Court Orders.

The University appeals the district court's grant of summary judgment in favor of AGA on both the '291 and '281 patents.

In its 2009 *Markman* Order, the district court agreed with AGA that the claims of the '291 patent require separate and distinct first and second disks that are affixed to one another. (A6.) While the court found that the terms "affixed," "joined," and "connected" were used in the ordinary sense of those words, it held that the necessary implication of those words in the claims is that the affixed/joined/connected disks must have been originally separate. (A8–9.) Based on this claim construction, the court subsequently granted summary judgment that AGA's unitary occluders do not infringe the '291 patent. (A55–56.)

With respect to the '281 patent, however, the district court in its *Markman* Order rejected AGA's argument that "in communication with" also requires originally separate disks that are attached together. (A13–17.) Instead, the court held that, based on the ordinary meaning of "in communication with," the claims

require interior spaces that are connected to one another. (*Id.*) In its subsequent summary judgment ruling, however, the district court recognized that this construction could not be reconciled with the '281 patent disclosure, and revised its construction to hold that the phrase covers any sort of relationship between two members where movement of one member is transmitted to the other. (A43.) Based on that construction, there was nothing to distinguish the asserted claims of the '281 patent over the prior art. Thus, the district court subsequently issued a second summary judgment ruling, this time granting summary judgment that the '281 claims are anticipated by King and a second prior art reference called Lock.[2] (A69.)

Finally, in the 2009 *Markman* Order, the district court also stated that, in attempting to broaden the claims to cover AGA's devices, the University had so garbled the language of the '281 patent claims that it was impossible to tell what structure in the claims performed the claimed function of "tautly holding" a portion of the closure device against the septum. (A17–22.) Based on this garbled claim language, the court granted AGA's motion for summary judgment of invalidity of the '281 patent based on indefiniteness. (A69.)

---

[2] Similar to the King device, the Lock "clamshell" occluder, described in a 1990 article entitled "Transcatheter Closure of Atrial Septal Defects" ("Lock"), was another double umbrella device with each umbrella made up of radial arms. (A5487–95.) For the purposes of this appeal, there are no material distinctions between King and Lock.

## II.    SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment that AGA's unitary septal occluders do not infringe the '291 patent. All of the claims of the '291 patent require disks that are "affixed," "connected," or "joined" to one another. Based on this language, the district court correctly interpreted the claims as requiring separate and distinct disks and excluding a unitary structure. The broadest statement of the "invention" in the patent states that central portions are "affixed" to one another form a conjoint disk. "Affixed" is a word that is only used to describe two physically separate parts that have been attached together. That construction is consistent with both the preferred embodiments of the patent and the University's description of the invention during prosecution. Finally, during prosecution of a foreign counterpart, the University expressly distinguished prior art showing a unitary structure on the basis that it did not have two disks "affixed" to one another.

The district court should have granted AGA's motion for summary judgment of non-infringement of the '281 patent for the same reason. The claims of the '281 patent require that portions of the claimed members be "in communication with" one another. The district court's construction of "in communication with" is not the ordinary meaning and is inconsistent with the intrinsic and extrinsic evidence. When as here the claim language is not clear, the fact that the patentee may

generally have intended to broaden the claim language does not trump the remainder of the intrinsic evidence, particularly the fact that the broadest statement of the invention in the patent requires structures "affixed" to one another.

Regardless, however, the district court correctly granted summary judgment of invalidity of the asserted '281 patent claims. The University does not dispute that King and Lock show all of the claim limitations except two. As for the first, the district court's construction of "in communication with" gives the limitation essentially the same scope as that originally advocated by the University in the litigation. Having obtained that claim scope, the University cannot now save its claims from invalidity by reading limitations into the claims that have no basis in the claim language. As for the second disputed limitation, the undisputed evidence shows that, for the purpose of the claimed expanding function, the radial legs shown in King and Lock are equivalent to the peripheral legs disclosed in the '281 patent. The University's evidence to the contrary is both conclusory and improperly directed to unclaimed functions. Moreover, the University's argument that it disavowed radial frames during prosecution is (a) wrong because the statements made during prosecution were based on fundamentally different claim language; and (b) inconsistent with the fact that the University successfully convinced the district court that the claim limitation at issue is *not* limited to a peripheral frame.

Finally, the district court correctly granted summary judgment that the claims of the '281 patent are invalid as indefinite. In the course of its efforts to broaden the claims to cover AGA's devices, the University amended the claims in such a way that it is no longer possible to tell which element performs the function of "tautly holding" a portion of the closure device against the septum. Because the scope of the claims is different depending on which element performs that function, the inability to determine which element performs the tautly holding function renders the claims invalid as indefinite.

## III. ARGUMENT

### A. Standard of Review.

The University correctly states that this Court applies a *de novo* standard when reviewing a district court's grant of summary judgment. Claim construction is also a question of law that this court reviews *de novo*. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1299 (Fed. Cir. 2004). Summary judgment of non-infringement should be affirmed when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device. *Irdeto*, 383 F.3d at 1299. Summary judgment of invalidity based on anticipation should be affirmed if there is no genuine issue of fact regarding the presence of each limitation of the properly interpreted claim in a single prior art reference. *Upsher-Smith Labs. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1323–24 (Fed.

Cir. 2005). Indefiniteness is a question of law, so summary judgment of invalidity should be affirmed if the district court correctly concluded that the claims are indefinite. *Datamize, L.L.C. v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

## B.    AGA's Devices Do Not Infringe the '291 Patent.

All of the asserted claims of the '291 patent recite first and second disks having portions that are "affixed to," "joined to," or "connected to" one another. (A122–23.) Based on this claim language and the other intrinsic evidence, the district court correctly interpreted the claims to require "disks that, before being affixed, joined, or connected, exist separately as individual, physically distinct disks." (A41.) Because AGA's unitary mesh occluders undisputedly lack two separate disks affixed to one another, the district court's ruling should be affirmed.

### 1.    The University Wrongly Characterizes the District Court's Ruling.

In its Appeal Brief, the University attempts to confuse the issue by characterizing the district court's construction as relating only to the claimed "first and second occluding disks." (Univ. Br. at 19.) But the court did not, as the University suggests (Univ. Br. at 19–22), improperly import limitations from the specification into the term "disks." Nor did the district court conclude that "separate elements must be made from separate pieces." (Univ. Br. at 22.) Rather, the district court explicitly relied on the meaning and use of the claim terms

20

"affixed," "joined," and "connected," which are used in the asserted claims to describe the physical relationship between the claimed disks. (A9.) As this Court has instructed, "the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

The district court made this clear in both its initial *Markman* ruling and in its subsequent summary judgment order. In its *Markman* briefing, AGA asked the district court to construe the claims based on the words "affixed/joined/connected" to require physically discrete and separate disks that are physically connected to one another, and to exclude a unitary structure. (A367, A370.) Although the district court adopted slightly different language for its formal construction, the court left no doubt that it agreed with the substance of AGA's argument, stating: "AGA's central point—that the '291 patent covers a device with physically separate disks, and that this property of physical separateness is entailed by the patent's use of the words 'affix,' 'join,' and 'connect'—is well taken." (A9.)

As charitably stated by the district court, despite this clear statement, the University either did "not understand, or refuse[d] to accept, the clear import of the Court's earlier construction." (A41–42.) Thus, in granting summary judgment of noninfringement, the district court clarified its original construction with a substantively identical construction: "The word 'disks' in the phrases 'first and

second occluding disks' . . . means 'disks that, before being affixed, joined, or connected, exist separately as individual, physically distinct disks." (A41.) Again, however, the court made clear that its interpretation flowed from the "affixed/joined/ connected" language in the claims and the other intrinsic evidence. (A42.)

The fact that the district court found that affixed, connected, and joined are "ordinary English words" that "do not need to be construed" (Univ. Br. at 19, citing A8) is irrelevant. As this Court has held, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Regardless of how clear the individual words of the claim are, the parties presented the district court with the issue of whether the claim requirement for disks affixed/joined/connected to one another excludes a unitary structure, and it was incumbent on the district court to resolve that issue as a matter of claim construction. *Id.*

## 2. The District Court Correctly Construed the Claims of the '291 Patent to Cover Only Disks that Have Been Physically Attached to One Another.

### a. The Plain Meaning of the Terms Supports the District Court's Construction.

The University says that "affixed" should be interpreted to mean "attached in any way" and suggests that different portions of a unitary structure are by definition "affixed." (Univ. Br. at 20–21.) The University cites extrinsic evidence for the proposition that this is the "plain meaning" of the term. (*Id.*) But the University's construction is not even consistent with the dictionary definition it cites, which defines "affix" first as a transitive verb meaning "to attach physically" as a "stamp to a letter" and second "to attach in any way." (A669.) The University ignores the necessary implication that things that are "affixed" have *been* attached—i.e., they were originally separate. As the district court aptly pointed out, "no one would say that the left half of [a] block of marble is 'affixed' to the right half," or, if a statue was carved out of the block of marble, that "the top half of the statue was 'affixed' to the bottom half." (A10.)

Other district courts addressing the claim term "affixed" have reached the same conclusion. *See Gen-Probe Inc. v. Becton Dickinson & Co.*, No. 09-cv-2319, 2011 U.S. Dist. LEXIS 131820, at *48 (S.D. Cal. Nov. 15, 2011) ("The term 'affixed to' means 'physically attached or fastened to and not integral with.'"); *Indiana Mills & Mfg., Inc. v. Dorel Indus., Inc.*, 369 F. Supp. 2d 1010, 1018–19

23

(S.D. Ind. 2005) ("affixed" means "secured" and suggests that more than one piece is contemplated); *V-Formation, Inc. v. Benetton Group SpA*, No. 01 Civ. 610, 2002 U.S. Dist. LEXIS 22394, at *30–31 (S.D.N.Y. Nov. 20, 2002) (rejecting argument that toe and heel plates that were integrally formed with the sole surface met claim reciting an upper surface "affixed" to the sole surface of an inline skate boot).

As for the other claim terms "connected to" and "joined to," AGA does not dispute that these terms, in the abstract, do not always exclude a unitary structure. In this regard, those words are sometime used in a manner slightly broader than "affixed," which *always* connotes separate structures. This is reflected by the fact that the University can point to several instances where AGA's marketing material uses "connected" and "joined" to describe the relationship between parts of its unitary occluders, but cannot point to any instances in which AGA describes those parts as being "affixed" (or "attached") to one another. (*See* Univ. Br. at 30–32.)

In the present case, however, *the University agreed that "affixed," "joined," and "connected" in the claims of the '291 patent should all be given the same meaning*. (A305; A2424–25.) This is not surprising considering that the claims of the '291 patent use the terms interchangeably. Specifically, independent claim 24 states that central portions of the membranes are "joined to" one another and then later refers to "the affixed central portions." (A123, col.19 ll.22–32.)

Moreover, words in claims are not construed in a vacuum, but rather "must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370, 372 (1996). As discussed in the next section, the specification shows that the concept of ***affixing*** two disks together was a fundamental aspect of the invention described in the '291 patent, and thus confirms that this is the common meaning that should be assigned to all three claim terms.

> **b.    The Specification Shows that the Invention Consisted of Originally Separate Disks that Were Brought Together.**

Although it pays lip service to *Phillips*, the University completely dismisses the intrinsic evidence from the specification that properly informed the district court's claim construction. A construction including the idea of originally separate disks is the only one that is supportable in light of the '291 specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*) ("[C]laims ***must*** be read in view of the specification[.]") (emphasis added).

In the "Summary of the Invention," the '291 specification describes the "invention" as having first and second occluding disks "which are attached to one another." (A115, col.3 ll.5–20.) This is achieved by "affix[ing]" the central portions of the membranes of the two disks to one another. (*Id.*) These "affixed central portions" define a "conjoint disk." (*Id.*) Such description compellingly

indicates that the invention requires that the disks must first exist as separate components that are then attached together to form a conjoint disk. And, given that the description relates to the "invention," it cannot be dismissed as describing only a preferred embodiment; when the specification describes the invention in a way that is consistent with only one construction of a disputed claim term, the court must adopt that construction. *See, e.g., Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1313 (Fed. Cir. 2007); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329–30 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v. ITT Indus. Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

Moreover, all of the preferred embodiments of the '291 patent are consistent with this statement of the "invention." While the University baldly asserts that "the figures depicting specific embodiments of the invention are consistent with a one-piece occluder" (Univ. Br. at 24), it is has pointed to *no* description, depiction, or allusion to such a one-piece device. The specification only describes embodiments where the two disks first exist separately and then are attached together. In the preferred embodiment of Figures 2–11, this is done by sewing, gluing, or otherwise affixing the central portions of the membrane to one another. (A117, col.7 ll.49–59.) As for the balloon embodiment of Figure 12—even assuming that it is covered by the '291 patent claims—the annotated drawing below shows an attachment relationship between the two disks:



Attachment Points

*Fig.12*

(A110.) The device consists of two separate membranes 122 and 132, with central tubular portions 123 and 133 that overlap and attach at their ends to form a conjoint disk 140.

A number of Federal Circuit decisions reflect similar conclusions reached after analyzing claim terms similar to those at issue here. In *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142 (Fed. Cir. 2004), one of the issues was whether the claim term "connect" required a direct connection between elements. The Court recognized that "connect" could, in the abstract, encompass both direct and indirect connections. *Id.* at 1150–51. However, the specification only disclosed direct connections, and all of the relevant figures showed only direct connections between the relevant structures. *Id.* Under these circumstances, the Court held that the district court properly limited the claims to direct connections. *Id.*; *see*

*also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293,

1305–06 (Fed. Cir. 2005) (interpreting "joined" in view of the specification to

require a direct connection between elements); *Toro Co. v. White Consol. Indus.,*

*Inc.*, 199 F.3d 1295, 1300–02 (Fed. Cir. 1999) (interpreting "including" in view of

the specification to require a mechanical attachment between components);

*Dentsply International, Inc. v. Hu-Friedy Mfg. Co., Inc.*, 202 F. App'x 464, 467–

68 (Fed. Cir. 2006) (non-precedential) ( interpreting "tip" to require a component

separate from the connecting body, based in part on specification statement that the

tip is "axially attached to the connecting body").

The cases cited on page 22 of the University's brief are all distinguishable.

The University replies primarily on *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d

1221 (Fed. Cir. 2011) and *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653

F.3d 1296 (Fed. Cir. 2011).  In neither of those cases did the claim at issue contain

express claim language, as here, requiring that the two elements at issue be

"affixed," "joined," or "connected" together.  *See Powell*, 663 F.3d at 1229;

*Retractable Techs.*, 653 F.3d at 1299–300.  Also, in neither of those cases did the

specification describe the "invention" as requiring separate elements affixed or

attached to one another, as the '291 specification does.  To the contrary, the

specification in both cases contained express language suggesting that the two

elements at issue could be unitary. *See Powell*, 663 F.3d at 1231–32; *Retractable Techs.*, 653 F.3d at 1304.

The third case cited by the University, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) involved the claim term "connected to" in a patent directed to an electronic information transmission system. As the Court recognized, electrical connections often occur within elements located in the same housing or on the same circuit board. *NTP*, 418 F.3d at 1310–11. The fact that "connected" in the context of electrical circuits does not imply separateness does not mean that the same is true here. *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254–55 (Fed. Cir. 2010) (claim for safety needle reciting a spring means "connected to" a hinged arm required that the spring means and the hinged arm be separate structures based on the plain language of the claims and the fact that the specification disclosed only separate structures). Moreover, as discussed above, the issue here is not what "connected" means in the abstract, but what it means in the context of the '291 patent as a whole.

The district court correctly held that—regardless of the meaning of "connected to" and "joined" in the abstract—in the context of the claims of the '291 patent, "affixed," "joined," and "connected" all require two originally separate pieces physically attached together and do not cover a unitary structure.

29

###### c.    The Prosecution History Further Supports the District Court's Construction.

During prosecution of the '951 application, the University distinguished its invention over King based in part on the fact that "applicant attaches the membranes of the two disks essentially directly to one another." (A1707.) The claims then pending recited the exact same language found in claim 1 of the '291 patent: "a central portion of the membrane of the fi[r]st disk being affixed to a central portion of the membrane of the second disk." (A1699–1700.)

At no time during prosecution of the subsequent applications did the University retract this statement. Having failed to do so, the University cannot avoid having its claims construed consistent with its own characterization of the Das invention that it provided to the PTO. *See Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 997–98 (Fed. Cir. 2006); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

In an attempt to negate its disavowal of claim scope, the University now says that it was distinguishing King based on the relative ease of implantation of the Das device. (Univ. Br. at 25.) The University's attempt fails. The claims as allowed and then pending did not recite limitations even arguably related to the deployment differences between King and Das. And even if they did, the fact that the statements may not have been necessary to distinguish over the King patent does not avoid the limiting effect of the applicant's characterization of the claimed

30

invention. *See Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576–77 (Fed. Cir. 1995); *Laitram Corp. v. Morehouse Indus., Inc.*, 143 F.3d 1456, 1462 (Fed. Cir. 1998); *Atofina*, 441 F.3d at 997.

### d.    The Extrinsic Evidence Also Supports a Construction Requiring a Non-Unitary Structure.

When the University filed for international patent protection corresponding to the Das patents, the initial search report found most of the claims to be unpatentable based on a prior art Soviet publication showing a single piece of material shaped into two disks and a middle waist portion. (*See* A513–19.) Upon submission to the European Patent Office, the University distinguished its claims over that one–piece device as follows:

> SU–A–1468511, as can be seen from Figure 2, and as described in the Abstract, has flanges 2,3 made in *one piece* with a <u>tubular</u> part 1. Each flange is equipped with a resilient element 5. This arrangement *certainly does not comprise two disks with a central portion of a first disk being affixed to a central portion of the second disk* as required in the main Claim.

(A520–21 (underlining in original, bold italics added).) Such statements made during foreign prosecution are relevant to claim construction of a corresponding U.S. patent. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir. 2005).

The University now argues that its statements had nothing to do with the prior art being "unitary" or "non-unitary" but rather distinguished the Soviet device

as having an opening through the middle and not having disks. (Univ. Br. at 29.) But the document says nothing about the Soviet device having an opening through the middle. Moreover, if the point had been that the Soviet device did not have two disks, the last sentence excerpted above would simply have stated: "This arrangement certainly does not comprise two disks." By adding, "with a central portion of a first disk being affixed to a central portion of the second disk," it is evident that the University considered this latter language necessary to distinguish over the prior art. Combined with the first sentence of the paragraph stating that the Soviet device is "made in one piece," it is clear that the University's basis for distinguishing the Soviet device was that it showed a one–piece, unitary structure—not two originally separate disks "affixed" to one another.

### e.   The District Court's Construction Does Not Improperly Limit the Claims Based on a Particular Method of Manufacture.

The University's argument regarding method of manufacture (Univ. Br. at 26–28) again misses the point of the district court's correct claim construction requiring two originally separate disks that are affixed to one another. AGA agrees that the claims "are not limited to a particular method of manufacture described in the specification" (Univ. Br. at 26), and the district court did not so limit them. (*See* A42–43 (noting that the specification supports the court's interpretation because it describes "the two disks are physically distinct things that must

32

*somehow* be joined to one another" but not limiting how the originally separate disks must be joined) (emphasis added).) The claims cover disks that are "affixed" by any method, including sewing, heat sealing, or "otherwise bonding." (A117, col.7 ll.49–66.) The point, however, is that they must be in a specific structural relationship that results only from being originally separate and then joined together by *some* process.

The University's cited cases on this point either support AGA or are inapposite. For example, in *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, this Court held that a claim reciting a thick layer and a "thin metal-filled outer layer integral therewith" meant the outer layer was "formed as a unit and in direct contact with the inner layer." 234 F.3d 1370, 1372 (Fed. Cir. 2000). Construing the '291 claims to cover disks that originally existed separately so that they could meet the structural limitation of being "affixed" to one another does not import a process limitation any more than having layers "formed as a unit" imports a process limitation so as to meet the structural limitation of being "integral." *See also Spectralytics, Inc. v. Cordis Corp.*, 576 F. Supp. 2d 1030, 1036–37 (D. Minn. 2008) (inapposite case rejecting defendant's argument that claim term "sized to be" should be construed to refer to a machine designer's intentions rather than to the size of the claimed components); *R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1425–27 (N.D. Ill. 1996) (holding that "affixed" described a structural

33

relationship that could be achieved by either applying stannous chloride to a conductive plate or by a chemical reaction which bonded the stannous chloride to the place; "affixed" described the result of either process, namely stannous chloride that was "bonded" to the plate rather than, for example, merely "in contact" with the plate); *CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 519–20 (D. Md. 1995) (holding that "being in the work-hardened pseudoelastic metallurgical state" is a structural limitation that could be met through a variety of processes);.

To the extent "affixed" carries an inherent reference to process at some basic general level, it was the University's choice to claim the alleged invention using this term. The University must live with that choice and accept that only disks that were originally separate and then joined together so as to be "affixed" infringe.

### 3.    There Is No Evidence Supporting Infringement Under the District Court's Correct Claim Construction.

The University does not dispute that, under the district court's claim construction, there is no evidence in the record from which a reasonable jury could find infringement. AGA's unitary mesh occluders simply do not contain two disks that are affixed to one another. Because the district court's interpretation of the '291 claims is correct, summary judgment of non-infringement in favor of AGA should be affirmed.

C.    **The Claims of the '281 Patent Are Both Invalid and Not Infringed by AGA's Devices.**

1.    **Under the Proper Construction of "In Communication With," AGA's Devices Do Not Infringe the '281 Patent.**

The district court struggled with construing the phrase "in communication with" in the claims of the '281 patent. The ordinary meaning of that phrase simply does not make sense to describe the relationship between the claimed "members" (i.e., disks) disclosed and claimed in the '281 patent.

However, the district court headed down the wrong path when, instead of starting with the intrinsic evidence, it began with extrinsic dictionary definitions, trying to find a common thread for the various meanings of "communication" that it could apply to claim 1 of the '281 patent. (A44–45.) A proper analysis that starts with the intrinsic evidence, instead of the extrinsic evidence, leads to the correct conclusion that "in communication with" should be given the same meaning as "affixed to," "joined to," and "connected to." Under this construction, AGA's devices do not infringe the '281 patent for the same reason discussed above with respect to the '291 patent.

a.    **The Intrinsic Evidence Shows that "In Communication With" Means "Affixed To."**

This Court's precedent instructs that, even when it differs from the ordinary meaning, the interpretation of a term that is most consistent with the specification controls. *E.g.*, *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358,

1362–63 (Fed. Cir. 2008); *Phillips*. 415 F.3d at 1321–22; *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The claim language—the first category of intrinsic evidence to be reviewed under *Phillips*—provides context to help focus the review of the remaining intrinsic evidence. "In communication with" is used in claim 1 of the '281 patent to describe the relationship between a "substantial portion of the central portion" of one member and a "substantial portion of the central portion" of the other member. (A142, col.18 ll.20–24.) Thus, the balance of the intrinsic evidence should be reviewed to determine: (1) what relationship between "substantial portions of the central portions" of the members (i.e., the disks) is disclosed; and (2) what about that relationship is disclosed as being important to the invention.

The '281 specification—which is identical to the '291 specification—does not use "in communication with" to describe any relationship between the two disks. Indeed, "in communication with" does not appear anywhere in it. While the noun "communication" appears twice, in neither instance does it refer to the disclosed occluding device, much less a "substantial portion of the central portion" of the disks of the device. (A140, col.13 ll.62–66; A142, col.18 ll.1–4.) Moreover, as the district court recognized, those other instances use "communication" to describe openings between cavities or enclosed spaces (the ordinary meaning of

"communication" in physical devices), and thus are not helpful in describing the relationship between the two disks of the disclosed devices. (*See* A45–47.)

As previously discussed with respect to the '291 patent, the only relationship between portions of the disks that is described in the patent is that they are affixed. The language regarding the "invention," which leads off the "Summary of the Invention" section of the specification, closely tracks the language of claim 1 and shows that the relationship between the central portions is that they are physically "affixed." (*See* A135, col.3 ll.9–24.) Moreover, the recitation of a conjoint disk that is "sized to be received within a septal defect" relates to the claimed requirement that "substantial portions" of the central portions be in communication with one another. (*Id.*) Such a statement regarding "the invention" is "a clear indication" regarding the meaning of claim terms. *Ormco*, 498 F.3d at 1313; *Honeywell*, 452 F.3d at 1318; *see also Edwards Lifesciences L.L.C. v. Cook Inc.*, 582 F.3d 1322, 1333 (Fed. Cir. 2009). As also discussed above, the specification only describes embodiments where the two disks first exist separately and then are attached together. *See supra*, Part III.B.2.b.

Finally, like the specification, the prosecution history describes only one relationship between portions of the disks: physical attachment. During prosecution of the original '951 application, the University emphasized the benefits of "attach[ing]" the membranes together to form a conjoint disk. (A1707.)

Nowhere in the prosecution history of any of the Das patents is another relationship (or benefit thereof) described. The University did not tell the examiner during prosecution of the '281 patent that any change in scope was intended by its substitution of "in communication with" for "affixed to." Moreover, the examiner did not recognize any difference in scope between the two terms. This is shown by the fact that he identified the deletion of the *size* of the conjoint disk as the only aspect in which claim 1 of the '281 patent was different from claim 1 of the '291 patent. (*See* A5310.)

Thus, when the intrinsic evidence is properly analyzed under this Court's precedent, "in communication with" as used in claim 1 of the '281 patent has the same meaning as "affixed to," "joined to," and "connected to" as the latter terms were construed by the district court.

> **b.    The Patentee's Intent to Broaden Claims Is Ineffective When, as Here, the Claim Language Is Not Clear and the Specification Does Not Support a Broader Construction.**

In both its *Markman* Order and subsequent summary judgment order, the district court's efforts to construe "in communication with" were heavily influenced by the fact that replacement of "affixed to" with "in communication with" during prosecution of the '281 patent suggested an intent to broaden the claims. (*See* A14, A49). The district court felt compelled to give effect to this intent. (*Id.*)

In appropriate circumstances, this Court has given weight to a patentee's expressed intent to broaden the claims. For example, in *Liebel-Flarsheim Co. v. Medrad Inc.*, the evidence showed that, during prosecution, the applicant removed the words "pressure jacket" from some of the claims for the specific purpose of covering devices without a pressure jacket. 358 F.3d 898, 901 (Fed. Cir. 2004). Refusing to interpret the claims as requiring a pressure jacket, this Court relied heavily on the fact that "applicants intended those claims to reach injectors that did not use pressure jackets." *Id.*

In *Liebel*, however, the scope of the broadening was clear from both the claim language and the prosecution history. The patentee had removed "pressure jacket" from the claim altogether, without substituting any other language that provided a textual hook for requiring a pressure jacket. Also, the applicant expressly stated during prosecution that, as a result of the amendment, not all of the claims required a pressure jacket. *Id.*

In the present case, the University did not simply remove an element from the claims; it replaced one term ("affixed to") with a different term ("in communication with") *whose ordinary meaning makes no sense in the context of the disclosed invention.* The University did not tell the examiner during prosecution that any change in scope was intended by its terminology change, and

the prosecution history indicates that the examiner did not recognize any difference in scope between the two terms. (*See* A5310.)

Moreover, in *Liebel*, this Court found that the pressure jacket was not identified in the patent as a critical component of the invention. *Liebel*, 358 F.3d at 908. In contrast, the '281 patent does not simply use "attached" and "affixed" in describing the preferred embodiment of the invention. Rather, the broadest statement of the "invention" in the '281 patent states that central portions of the disk membranes are "affixed," thereby "attaching" the two disks to one another at their centers. (A135, col. 3 ll.9–24.) To construe "in communication with" any broader than "affixed" would improperly expand the scope of the claims beyond that supported by the specification. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006).

In this regard, the present case is very similar to *Tandon Corp. v. U.S. Int'l Trade Com.*, 831 F.2d 1017 (Fed. Cir. 1987). *Tandon* centered on the meaning of "fixed in a direction normal to the plane" in reference to a disk drive transducer. During prosecution, several claims were arguably broadened from their original form (which stated that the transducer was "fixed") to a form requiring that the transducer be fixed "in a direction normal to the plane." *Id.* at 1021–22. Tandon argued that the plain language of the claim did not require the transducers to be completely fixed, but only required fixedness in the z direction. *Id.*

This Court rejected Tandon's effort to enlarge the disclosed invention by amendment. First, the Court noted that the patentee said during prosecution that its invention permitted no movement in any direction. *Id.* at 1023. This is very similar to the present case, where both the specification and the prosecution history describe the "invention" as requiring that the central portions of two membranes be "attached." *See supra* Parts III.B.2.b–c.

Next, the Court held that the amendment adding "normal to the plane" to the claims "can not enlarge the scope of the claims beyond that supported in the specification, and can not change the disclosure in a way contrary to its substance as filed." *Tandon*, 831 F.2d at 1023. To hold otherwise would violate the rule against adding "new matter" to the patent application during prosecution. *Id.* That is true in the present case as well. "In communication with" did not appear in the specification or claims as filed. Therefore, the term cannot change the scope of the claimed invention to make the relationship between the central portions of the members something beyond what is supported by the specification, i.e., an attached physical relationship. *Id.*; *see also On Demand*, 442 F.3d at 1340 ("[T]he claims cannot be of broader scope than the invention that is set forth in the specification.").

Finally, the Court rejected Tandon's claim differentiation argument, noting that while "there is presumed to be a difference in meaning and scope when

different words or phrases are used in separate claims," this presumption does not override the more general rule that the claims cannot be construed "broader than what is contained in the specification and claims as filed." *Id.* at 1023–24. Again, this reasoning is applicable here. Any inference or argument that replacement of "affixed" with "in communication" suggests that a different meaning was intended must give way to the fact that the specification and claims as filed do not support a broader definition. *Id.*; *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.").

Under the proper construction, the district court should have granted summary judgment of non-infringement of the '281 patent for the same reason that summary judgment was granted as to the '291 patent.

### 2. Under the District Court's Construction of "In Communication With," the Asserted Claims of the '281 Patent Are Anticipated by King and Lock.

The University does not dispute that the King and Lock references disclose a device with all but two elements of the '281 patent claims. The disputed elements are (a) members with "substantial portion[s] of the central portion[s] . . . being in communication with" one another; and (b) each member having a "structure . . . for moving the member between a compressed orientation... and an expanded

42

orientation." The district court correctly concluded that King and Lock disclose both of these disputed elements and, therefore, anticipate the asserted claims of the '281 patent.

> **a.    Under the District Court's Claim Construction, the King and Lock Devices Satisfy the "In Communication With" Requirement.**

In denying AGA's motion for summary judgment of non-infringement, the district court changed its construction of "in communication with" to the following:

> A portion of a first member is "in communication with" a portion of a second member if those two portions are arranged in such a way that movement of one portion is transmitted to the other portion.

(A43.) Although AGA does not agree with this interpretation for the reasons discussed in the previous section, there is no dispute that under this interpretation, the "in communication with" limitation is met by King and Lock. In both King and Lock, the entire "central portions" of the disks are interconnected to one another, meaning that movement of one central portion will result in movement of the other central portion. The following annotated versions of Figures 11 and 14C from King show the hubs of the two umbrellas being locked securely together:



Central portion of
second member      Central portion of
first member

FIG. 14C.

(*See* A5172–73.) Similarly, the central portions of the two umbrellas in Lock

interconnect as shown in the following annotated figure from Lock:



Central
Portions

(*See* A5492.) Thus, the Court correctly found that King and Lock meet this

limitation.

> **i. There Is No Basis in the Claim Language to Limit "Transmission of Movement" to Any Particular Type of Movement.**

Ironically, the district court's revised construction is very similar to the

construction that the University originally advocated for "in communication with."

In its *Markman* brief, the University argued that the phrase merely meant

"interconnected with," without any limitations on the type of interconnection. (A550–52.)  Yet the University now argues that the central portions of two members are only "in communication with" each other if they are interconnected in a particular way: so as to transmit an expansion movement during deployment from the catheter.  (Univ. Br. at 47–48.)

    The problem with the University's changed position is that the claim language simply will not support it.  It does not derive from the ordinary meaning of "in communication with."  The claim language does nothing to limit the requirement that substantial portions of the central portions be "in communication with" one another only upon moving from a compressed to an expanded configuration.  To support its argument, the University merely points out that a *different* portion of claim 1 requires a "self-expanding structure" that causes movement between a compressed orientation and an expanded orientation.  (Univ. Br. at 47.)  However, that is a different limitation.  The fact that a different portion of the claim recites such movement does not somehow change the meaning of "in communication with."

    Nor does the specification so limit the term; in fact, the specification discusses the "stress-inducing movement" resulting from heartbeats once the device is placed in a person, which could arguably lead to mechanical failure of a

device that could not transmit movement across its two disk portions. (*See* A138, col.10 ll.41–65.)

To the extent the Court agrees with the district court's broad construction of "in communication with," there is no basis to narrow it in the artificial way advocated by the University.

### ii. The University's "Substantial Portions" Argument Also Ignores the Claim Language.

The University also argues that King and Lock do not meet the claim language because the central portions of King and Lock are too small. (Br. at 49–52.) The University argues that the words "substantial portion" in the claims require that large portions of the two members be "in communication with" one another. (*Id.*)

This is simply another improper attempt to re-write the claim language. Claim 1 does not require that substantial portions of the claimed "members" be in communication with one another; it states that "at least a substantial portion *of the central portion* of the first member be in communication with at least a substantial portion *of the central portion* of the first [sic, second] member." (A142 (emphasis added).) Under the plain language of the claim, a device having members with small "central portions" will meet this claim language as long as a "substantial portion" of those central portions are "in communication."

In King, the central hub and sleeve of the two disks are "central portions":



Central portion of          Central portion of
second member              first member

(*See* A5172–73 (notations added).)  Because the ***entire*** hub and sleeve of King

interlock, it follows that the ***entirety*** of the central portions (which is "at least a

substantial portion") in King are "in communication with" one another under the

Court's revised interpretation.  The same is true of Lock.  (*See* A5492.)  Therefore,

King and Lock meet the claim language.

Having chosen to draft the claim language as it did, the University cannot

now avoid the fact that that the chosen claim language reads on the prior art.  *See*

*Brown v. 3M*, 265 F.3d 1349, 1352–53 (Fed. Cir. 2001) (affirming summary

judgment of anticipation where prior art disclosed two-digit date conversion and

claim recited the broader capability of two-, three-, *or* four-digit date conversion).

b.  **King Discloses "A Self-Expanding Structure Exhibiting a Spring-Like Behavioural Component for Moving the Member Between a Compressed Orientation . . . and an Expanded Orientation."**

The district court construed the "self-expanding structure" in claim 1 of the '281 patent to be a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6. (A22.) Accordingly, the court undertook the two-step process of determining the claimed function and then identifying the corresponding structure(s) in the specification for performing that function. *See JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005). Under this Court's precedent, the scope of the claim includes structures "identical or equivalent" to the corresponding structure(s) disclosed in the patent. *Id.* at 1333.

In claim 1 of the '281 patent, the claimed function performed by the "self-expanding structure" is not disputed by the University: "moving the device from a compressed orientation to an expanded orientation." (A22; A142.) At the University's urging, the district court found that the '281 specification discloses two structures that perform this function: "(1) a flexible, elastically deformable frame carried around the periphery of the member; and (2) a frameless membrane made of a thin piece of a superelastic material." (A22.)

In granting AGA's motion for summary judgment, the court found that the radial frames disclosed in King and Lock are equivalent to the disclosed peripheral frame for the purpose of performing the function of expanding the membrane from

48

a compressed to an expanded orientation. (A78–81; A88–90.) This finding should be affirmed. Contrary to the University's arguments, it did not disclaim the structures disclosed in King and Lock with respect to the means plus function claims in the '281 patent. Moreover, the University has pointed to no evidence that, *for the purpose of the claimed function*, the radially extending frame in King and Lock is not equivalent to a peripheral frame.

> **i.    The University Did Not Disclaim a Radially Extending Frame as a Structure for Moving the Claimed Device from a Compressed to an Expanded Orientation.**

In arguing that King does not anticipate, the University states that, during prosecution, the "radial umbrella arm design was specifically discussed and overcome as not anticipating the Das invention *as it was then being claimed*." (Univ. Br. at 38 (emphasis added).) While true, the latter part of this statement is key; the University's arguments distinguishing King during prosecution were based on *different* claim language that was *removed* during subsequent prosecution. Once again, the evolution of claims during prosecution to try to cover AGA's devices rather than Dr. Das's actual invention sinks the University's argument.

Arguments based on the prosecution history of a parent application are generally only relevant to construction of claims in a child patent when the related patents share the same claim language. *E.g.*, *Ventana Med. Sys., Inc. v. Biogenex*

*Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005).  When a later, related claim not only alters the language but removes a previously-claimed limitation, there is no prosecution disclaimer. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1305–06 (Fed. Cir. 2001).  "[T]he prosecution history of a claim contained within an ancestor patent will not be relevant to the construction of a claim in a child patent when those claims have differing limitations." *Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571, 597 (D.N.J. 2006).

King was only discussed during prosecution of the application that led to the original '217 patent.  In that application, the examiner rejected claims requiring "an elastically deformable frame carried about the periphery of the membrane" as being anticipated by King. (A1625–29; A1671.)  Responding to this rejection, the University changed the claim language to require frames "extending along and attached adjacent to the periphery of the membrane," and relied on this language to distinguish King's radially extending arms. (A1707.)

In its subsequent efforts to obtain claims covering AGA's devices, however, the University fundamentally changed the claimed invention.  In the '281 patent application, the University explicitly and intentionally removed the requirement of a frame of any sort, claiming instead "a self-expanding structure exhibiting a spring-like behavioural component for moving the member between a compressed

orientation . . . and an expanded orientation." (A969.) There is no shared or even similar claim language limiting the claimed invention to a peripheral frame. The University's distinguishing of King as having a radial frame as opposed to the peripheral frame claimed in the '217 patent simply has nothing to do with the '281 patent claims. Neither King nor Lock was discussed in the prosecution of the '281 patent, and no structure was ever disavowed as an equivalent.

Thus, this case is unlike any case cited by the University. *See, e.g.*, *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1360–61 (Fed. Cir. 2001) (disclaimer related to "valve means" in parent application applied to continuation claims requiring same "valve means"); *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367–68 (Fed. Cir. 2001) (examiner's rejection of claim for single-clamp embodiment coupled with patentee's acquiescence and substitution of "gripping means" language in reexamination for dual-clamp language in original patent established that single-clamp embodiment was not covered by claims). It is more akin to *Metrologic Instruments, Inc.*, a case in which the related patents contained very similar means-plus-function language related to "bar code detection means." 460 F. Supp. 2d at 593–97. The claimed function in the ancestor patent was "processing produced scan data when activated . . . ," while the claimed function in the child patent was "processing produced scan data . . . ." *Id.* Although the patentee had distinguished the ancestor claims from

51

the prior art based on the fact that his invention required activation before bar code symbol detection, the later patent claims were not so limited because the patentee had elected to remove the "when activated" limitation from them. *Id.* at 598; *see also Ventana*, 473 F.3d at 1182 (claims requiring "dispensing" could not be narrowed based on disclaimer of a specific method in connection with ancestor application claiming "dispensing a selected reagent directly to a sample.")

The University also seeks to bolster its disavowal argument by pointing out that AGA advocated for disavowal during claim construction in the district court. (Br. at 40.) However, the issue during claim construction was not whether the University had disclaimed a radial frame as being equivalent to a peripheral frame. Rather, the issue was what "corresponding structures" were disclosed in the '281 patent for performing the claimed function of moving the device from a compressed to an expanded orientation. The University's position was that there were two "corresponding structures" disclosed the '281 patent: a peripheral frame structure and an alleged "frameless embodiment" made out of a sheet of nitinol.[3] (A561–62.) AGA argued that the only "corresponding structure" disclosed in the '281 specification was the peripheral frame. (A382–85.) It was only as part of

---

[3] The specification states that "if the membranes are themselves formed of a superelastic material, they will tend to return to their original shape without a frame, so the frame may be omitted if so desired." (A136, col. 5 ll.31–35.) AGA's position, though not presented in this appeal, is that this structure is not a "corresponding structure" under § 112(6), nor is it enabled by the specification. (*See* A5011–20.)

explaining why the alleged "frameless embodiment" could not be a corresponding structure that AGA pointed to the statements made by the University during prosecution of the '217 application to overcome King. (*Id.*)

Moreover, *AGA lost that argument* at the district court. The district court agreed with the University that the '281 patent discloses a "frameless embodiment" that constitutes a second "corresponding structure." (*See* A22.) In this regard, it is the University who is improperly trying to have it both ways, not AGA. The University does not contend that AGA's accused devices have a peripheral frame or its equivalent; rather, its infringement theory is based on the alleged "frameless embodiment." (*See, e.g.*, A3162.) Thus, the University needed to convince the district court that no disavowal occurred as a result of the '217 prosecution in order to keep its infringement case alive. Having succeeded in doing so, the University cannot now seek to save its claims from invalidity by arguing that a disavowal did occur. As the University acknowledges, claims must be construed the same for validity as infringement. (Univ. Br. at 38, *citing Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239–40 (Fed. Cir. 2009).)

> ### ii. For the Purpose of the Claimed Function, the Radial Frames of King and Lock Are Equivalent to the Peripheral Frame Structure in the '281 Patent.

The University next argues that there is a disputed issue of fact as to whether the radial frames of King and Lock are equivalent to the peripheral frame disclosed

in the '281 specification. (Univ. Br. at 41–45.) In doing so, however, the University implicitly—and improperly—urges the Court to adopt a revised claim construction importing functions that are not recited in the claim. Such a revised claim construction would violate the law of means-plus-function claiming. The University offered nothing to rebut AGA's evidence that, for the claimed purpose of expanding the collapsed device, the King and Lock radial frames are equivalent to a peripheral frame.

One tenet of means-plus-function claim construction is that functions different from those "explicitly recited in the claim" may not be adopted. *JVW Enters.*, 424 F.3d at 1331. A device meets a means-plus-function claim limitation if it has a structure that performs the function recited in the claim and is identical or equivalent to the corresponding structure in the specification. *E.g., Applied Med. Res. Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006). A party may prove that structures are equivalent by showing that they "perform the identical function in substantially the same way, with substantially the same result." *Id.* In analyzing an allegedly infringing or anticipating device, "the inquiry should be restricted to the way in which the structure performs the ***properly-defined function*** and should not be influenced by the manner in which the structure performs other, extraneous functions." *Id.* at 1334 (emphasis in original). Also, when a patent discloses multiple "corresponding structures" for

performing a claimed function, a finding that a prior art reference discloses any one of the disclosed structures, or their equivalents, is sufficient for anticipation purposes. *In re Guess*, 347 F. App'x. 558, 560 (Fed. Cir. 2009).

Here, the recited function is "moving the member between a compressed orientation for passage through a medical instrument having an inner diameter and an expanded orientation having an enlarged diameter." (A142.) The University did not argue for any additional functions to be imported in claim construction (*see* A2269–70), nor could it have been successful in doing so under the law. *See JVW Enters.*, 424 F.3d at 1331 ("[A] court may not construe a means-plus-function limitation by adopting a function different from that explicitly recited in the claim.") (internal quotation and citation omitted).

Yet the University now seeks to rely on certain alleged advantages that the Das invention has over the King and Lock devices, namely filling the opening of a septal defect and self-centering. (Univ. Br. at 42–45.) The University argues that because the radial frames disclosed in King and Lock do not perform these unclaimed functions, those radial frames cannot be equivalent to the '281 patent's peripheral frame. (*Id.*) The University is wrong. The only proper inquiry is whether the radial nitinol frames of King and Lock perform the claimed function of expanding the device upon leaving the catheter in the same way, and achieve the same result, as the peripheral nitinol frame disclosed in the '281 patent.

As explained by AGA's expert, Dr. Charles Mullins, the radial frames of King and Lock perform the function of expanding the device in the same way as the peripheral frame of the '281 patent. (A5103.) Specifically, both are made up of legs that are folded to allow the device to be inserted into a catheter and, upon exiting the catheter, automatically unfold to their original expanded orientation. (*Id.*) The result achieved is also the same. The folding permits the member to fit in the catheter, while the unfolding causes the member to return to its enlarged diameter. (*Id.*) Dr. Mullins further stated that a person of ordinary skill in the art would regard folded legs of a center hub (as disclosed in King and Lock) to be interchangeable with folded peripheral legs (as disclosed in the '281 patent) for the purpose of performing the function of moving the frame member between a compressed orientation for passage through a medical instrument and an expanded orientation upon exiting the catheter. (A5104.) For purposes of the function of compression and expansion, the differences between the leg arrangements of the '281 patent and the King patent are minor and insubstantial. (*Id.*)

The inventor admitted as much, testifying that the peripheral framework had no advantage over the radial framework for the purpose of opening up the device:

> Q:    Did you think that the frame around the periphery was a better way of opening the fabric and making it taut than having arms off of a hub?
>
> Mr. Conneely:    Same objections.

The Witness:        No.

(A5323.)

The University has come forth with no evidence to the contrary. Its expert report from Dr. Martin O'Laughlin contains only the broad conclusion, unsupported by any identified basis, reasoning, facts, or data, that "I do not agree that the umbrella-like radially extending hub-and-spoke 'frames' of the King disclosure are equivalent to a frame carried around the periphery of the member." (A5358; A5366.) Such a conclusory statement is insufficient to avoid summary judgment and rightfully dismissed as "*ipse dixit*" (A90). *Sitrick v. Dreamworks, L.L.C.*, 516 F.3d 993, 1000–01 (Fed. Cir. 2008); *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir. 2007). What is more, the conclusion does not even deny that the King radial frame is equivalent to the peripheral frame *for the claimed function of expanding the device.* That is the issue at hand, and there is simply no evidence in the record from which a reasonable jury could decide it in the University's favor.

### 3.    The Claims of the '281 Patent Are Indefinite.

#### a.    Legal Principals.

35 U.S.C. § 112, second paragraph, requires that a patent "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." A claim is invalid for indefiniteness if those skilled in the art would not understand what is claimed when the claim is

read in light of the specification. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986). When the words of the claim are not sufficiently precise to permit a potential competitor to determine whether or not he or she is infringing, the claim is invalid for failure to comply with § 112. *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).

**b.    One Cannot Determine What Performs the Tautly Holding Function.**

The indefiniteness problem with the '281 patent comes from the phrase "for tautly holding" in the claim language. In the original Das disclosure and the original '217 patent, there was no ambiguity. The specification stated that the frame holds the device taut and against the septum. The claims of the original '217 patent stated the same thing: a "frame being capable of being collapsed for passage through the catheter and elastically returning to a predetermined shape for tautly holding the membrane." (A857, col.18 ll.34–36.) But when the University sought claims that did not require a frame in the later '281 patent, it modified the claim language in a way that rendered it nonsensical:

> a first member and a second member each comprising
>> a self-expanding structure exhibiting a spring-like behavioural component for moving the member between a compressed orientation for passage through a medical instrument having an inner diameter and an expanded orientation having an enlarged diameter
>>> for tautly holding at least a portion of the closure device against a septum . . . .

(A142, col. 18 ll.12–18 (line breaks added).)

One cannot determine from this language *what* is supposed to hold the device tautly against the septum.  As the district court noted in its claim construction order, there are at least four nouns that "for tautly holding" could modify:  (1) an enlarged diameter; (2) an expanded orientation; (3) a member; and (4) a spring-like behavioural component.  (A17–19.)  Since there is no way to determine which of these structures performs the "tautly holding" function, the district court correctly held the claims invalid as indefinite.  (A100-01.)

The University argues that the district court's indefiniteness ruling cannot be reconciled with its statement in the *Markman* ruling that the "gist" of the claim was "clear enough."  (Univ. Br. at 56, *citing* A20.)   During claim construction, however, the district court was not asked to decide what structure in claim 1 of the '281 patent performs the "tautly holding" function; it was merely asked to construe "tautly holding."  (A17–22; A100.)  The fact that the "gist" of the claims may have been clear enough to construe "tautly holding" does not mean that the claims are sufficiently definite to determine what claimed structure does the tautly holding and thus comply with § 112.  (*See id.*)  Moreover, "[i]t is well settled that there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (internal quotations and citation omitted).

The University's reliance on *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357 (Fed. Cir. 2010) is misplaced. Unlike here, the claim language in *Funai Electric*—though "grammatically incongruous"—was capable of construction. 616 F.3d at 1371–72. In that case, the phrase "at least" was placed in an awkward position. But the district court reasoned that it modified the phrase "one of" because, "[o]therwise, 'at least' would have no meaning at all." *Id.* In stark contrast to the multiple options that "for tautly holding" could modify in this case, there was only one option in *Funai Electric*, so the court did not have to modify the claim language to determine which option was correct. Moreover, the specification in *Funai Electric* supported that construction. *Id.* at 1372. Here, the specification is completely unhelpful. The explanation it provides—that the frame holds the membrane taut against the septum—became irrelevant when the University removed that limitation from its claims in an effort to ensnare AGA's products.

On appeal, the University advocates for yet another noun that does the tautly holding: the "self-expanding structure." (Univ. Br. at 59.) However, the University provides no reasoning or analysis for why this possibility is any more plausible than the other four identified by the district court. (*Id.*) Thus, all this argument does is further establish the indefiniteness of the claim by further

increasing the number of possible claim elements that might perform the "tautly holding" function.[4]

Finally, the district court was not being needlessly persnickety about good grammar. Indeed, the question of what "for tautly holding" modifies in the '281 patent claims is not merely theoretical; the scope of the claim would vary substantially based on what element does the tautly holding. For example, under the district court's construction, the claimed "self-expanding structure" is a means-plus-function element that requires one of two disclosed "corresponding structures" or their equivalents: (1) the flexible frame carried around the periphery of the member; or (2) a frameless membrane made of a thin piece of a superelastic material. (A22.) Thus, if it is the self-expanding structure that performs the "tautly holding" function, then one of these two specific structures or their equivalents must do the tautly holding. However, if instead it is the "member" that

---

[4] If the University's appeal position is adopted, it would substantially change other aspects of the claim construction. As discussed above, the University successfully convinced the district court that the '281 specification discloses two "corresponding structures" for the claimed self-expanding structure: a peripheral frame and a "frameless membrane made of a thin piece of superelastic material." (A25.) However, nothing in the specification of the '281 patent links the "tautly holding" function to the alleged frameless embodiment. Therefore, if the University is correct that "tautly holding" is part of the function performed by the claimed self-expanding structure, this would remove any possibility that the alleged frameless embodiment could be considered a corresponding structure under § 112(6). (*See* A383.) Since the University's infringement theory is based on alleged equivalence to the frameless embodiment, not the peripheral frame, such a revised claim construction would destroy the University's infringement case.

does the tautly holding, then the claim would be substantially broader because it would allow *any* element of the member (including the self-expanding structure) to do the tautly holding.

Because the scope of the claims of the '281 patent is not sufficiently definite to allow a competitor to determine whether or not a device infringes, the district court's grant of summary judgment that the claims are invalid should be affirmed.

### c.     The District Court Did Not Err by Finding the Claims Both Anticipated and Indefinite.

The University argues that the district court erred by holding the '281 patent invalid on the basis of both anticipation and indefiniteness, asserting that the "district court must have understood what 'for tautly holding' modified when the district court applied the claim language to erroneously find that the claims were anticipated." (Univ. Br. at 57.)

But for the purposes of AGA's motion for summary judgment on anticipation, the court did not and *did not have to* construe the "for tautly holding" phrase or determine what it modified. The University did not (and still does not) argue that King and Lock lack any element having to do with "for tautly holding." (*See* A6607–21.) Thus, there was no reason not to undertake an anticipation analysis and resolve the disputes related thereto—none of which related to the "for tautly holding" issue.

To require the court to refrain from deciding whether a claim is anticipated based on a claim term that—although conceded to be present in the relevant prior art—is also indefinite is to require a waste of judicial resources for no legitimate reason. This Court has quite recently affirmed a lower court's finding that a claim was invalid based both on the prior art and indefiniteness. *Stamps.com Inc. v. Endicia, Inc.*, 437 F. App'x 897, 897 and 910 (Fed. Cir. 2011). The University is incorrect to the extent it suggests the Court should reverse because the district court found that the claims were both anticipated and indefinite or that the finding of anticipation somehow undercuts the finding of indefiniteness.

## CONCLUSION

For the foregoing reasons, the district court correctly dismissed the University's claims for infringement under both the '281 and '291 patents. The judgment should be affirmed.

June 19, 2012

Alan G. Carlson
J. Derek Vandenburgh
R.J. Zayed
Tara C. Norgard
CARLSON, CASPERS, VANDENBURGH,
    LINDQUIST & SCHUMAN, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
(612) 436-9600

Attorneys for Defendant-Appellee
AGA MEDICAL CORPORATION

## PROOF OF SERVICE

I hereby certify that two copies of the foregoing RESPONSE BRIEF OF

DEFENDANT-APPELLEE AGA MEDICAL CORPORATION were served by

U.S. mail on June 19, 2012 on counsel of record as follows:

        Kevin D. Conneely, Esq.
        David D. Axtell, Esq.
        Ruth A. Rivard, Esq.
        Benjamin P. Freeland
        Leonard, Street and Deinard
        150 South Fifth Street, Suite 2300
        Minneapolis, MN 55402

                _____
                J. Derek Vandenburgh

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that the word count of the

word processing software used to prepare this brief is 14,000 words.

June 19, 2012

Alan G. Carlson
J. Derek Vandenburgh
R.J. Zayed
Tara C. Norgard
CARLSON, CASPERS, VANDENBURGH,
    LINDQUIST & SCHUMAN, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
(612) 436-9600

Attorneys for Defendant-Appellee
AGA MEDICAL CORPORATION